[No. 5029.]

## McPhee & McGinnity v. Fowler et al.

1. **Appellate Practice—Abstract of Record—Assignments of Error—Objections and Exceptions.**

Assignments of error as to rulings on evidence will not be considered where the abstract contains no objection or exception to the ruling of the court, although in the assignment of errors the questions and answers are given and the statement is made that the testimony was received over the objection of the defendant and reference is given to the bill of exceptions, since the rules of this court require that the abstract shall show the objections and rulings thereon and the exceptions taken thereto.—P. 206.

2. **Bills and Notes—Orders—Failure to Perform Conditions—Drawee's Duty.**

Where the drawee of an order holds funds of the drawer subject, and sufficient, to pay such order, he is liable under his contract to accept the order, though there is a condition attached to his agreement of acceptance which has not been performed by the drawer.—P. 207.

*Appeal from the District Court of Arapahoe County.*
*Hon. Booth M. Malone, Judge.*

Action by Joseph Y. Fowler and others, doing business as Fowler and Company, against McPhee & McGinnity. From a judgment in favor of plaintiffs, defendants appeal. *Affirmed.*

Messrs. Patterson, Richardson & Hawkins, for appellants.

Mr. W. E. Richards, for appellee.

Mr. Justice Steele delivered the opinion of the court:

McPhee & McGinnity, lumber dealers in Denver, and W. W. McAlpine, who was operating a saw mill in New Mexico, were dealing with each other under a contract, by the terms of which McAlpine was to manufacture and sell to McPhee & McGinnity the

lumber produced at McAlpine's mill, and McPhee & McGinnity were to buy, at a stipulated price, all the lumber produced by McAlpine. During the month of June, 1893, certain orders on McPhee & McGinnity were drawn by McAlpine and purchased by Fowler & Company, the appellees. These orders were O. K.'d by the representative of McPhee & McGinnity at the McAlpine mill, and the orders were thereafter sent to the firm in Denver. Checks were drawn for the amount of each order, and the amount charged to McAlpine's account. Payment was stopped on the checks, and the orders were never paid. The firm of Fowler & Company brought suit in the district court of Arapahoe county upon these orders, and the trial resulted in a judgment for the defendants. Upon review, the court of appeals reversed the judgment, the case being reported in 13 Colo. App., page 185. Upon the second trial, a judgment was rendered in favor of the plaintiff for the sum of $1,754.95, from which judgment the defendants appealed to the court of appeals.

The defendants admit that they gave McAlpine authority to draw orders, but contend that a condition was attached to the agreement, and that McAlpine failed to perform the terms of the agreement. The testimony of J. J. McGinnity, with whom the agreement concerning these orders was made, presents the defendants' version of it. Mr. McGinnity's testimony upon the subject of the agreement is set out in the abstract as follows:

"I saw Mr. McAlpine at our office on the morning of June 19th. He asked for a statement of his account, and I had one prepared and gave it to him, showing the balance of $845.40. He told me he would have to have more money before going home. He said the account was all right, but there was not money enough to pay his bills. I told him we could

not advance him any more money, and gave him a
check for the amount due, $845.40. He said he would
have to have more money before going home; that
he was owing his men about twenty-seven or twenty-
eight hundred dollars, and other bills for supplies to
the mills approximating two thousand dollars, and
that, unless he could pay his men, they would not
continue to work, and he could not run the mill. I
told him that we did not have any money to loan;
that money was very hard to get. I explained that
to him, but, if he would come around in the after-
noon, I would, in the meantime, talk to Mr. McPhee,
and see what was best to do. That was the substance
of the conversation. In the afternoon, he came and
made the statement to us that he could not continue
to operate the mill, and his men would not work, un-
less he got this money, and he would have to have
at least $2,500.00 in addition to the amount of the
check that he got in the morning, in order to continue
to operate his mill. I explained to him that it was
very necessary for him to operate the mill, on ac-
count of the contract which he had with The Maxwell
Land Grant Company, to which we were parties;
that the mill had to be operated. He assured us that
if he had this and could pay his men one-half, he
was satisfied they would continue to work; if he could
pay his men half of what he was owing, and could
pay part of his other bills, he was satisfied he could
continue operating his mill, and we finally consented
that, if he was sure he could do this, we would ad-
vance to him the $2,500.00, provided he would return
the $845 check, so that we would know the money
was applied to paying the men or paying for sup-
plies; instead of taking the cash, he would give or-
ders on us for the amount. And we further stated
that we did not want the money which we advanced
to be applied to paying the men who worked for the

Smith and McAlpine, or the Red River mill, as we
knew it, and, in order that that should not be done,
we asked him to have our man, who was loading lum-
ber there, to make a notation on the orders he gave
for paying labor, that this man worked for McAlpine
at his plant, at the mill that was supplying us with
lumber. He said he had no objection to having that
done, and I told him we would advise our lumber
loader, Mr. Gibson, down there, to make a notation
on the orders, so that we would know the money
went to paying men who worked at the mill that sup-
plied us with lumber. That is the substance of it.
He said he was satisfied that, if he got this amount
of money, which was about half of what he owed, he
could arrange to keep the mill running. It was upon
that condition that the money was advanced.''

On cross-examination, McGinnity said:

''Mr. McAlpine assured us that, if we would ad-
vance the money, that he could make arrangements
with his men to operate the mill; that if he did not
get this money, he could not do it. We told him that
we would advance it to him upon that assurance.
Nothing was said as to the quantity of lumber he
was to manufacture, nor as to the number of days
he was to run the mill; he was simply to run the mill
according to the general contract. Mr. McAlpine
deposited this check with us before leaving our office,
and about the same time we charged up the interest
against him; that was five per cent. on twenty-five
hundred dollars. When Mr. McAlpine left our of-
fice, everything had been agreed upon by us with
reference to this arrangement, and he left the office
with full authority to draw the orders. I am not sure
that I remained in Denver until any of the orders
came in that were drawn under the arrangement by
Mr. McAlpine. We paid them promptly on their
presentation. We trusted Mr. McAlpine with regard

to running the mill. The checks will show that the amount of orders paid under the agreement was $1,413.73.''

The letter sent by McPhee & McGinnity to E. A. Gibson, their representative at Catskill, New Mexico, is copied into the abstract as follows:

"Denver, Colo., June 21st, 1893.
"E. A. Gibson, Esq.,
    ° Catskill, New Mexico.

"Dear Sir: Mr. McAlpine will probably give orders to some of his men on us, besides what he may pay them. Any orders that he asks you to O. K., you will note the same memorandum on that you did last time: 'This man worked for McAlpine at his mill.'

"You understand our reason for this is, that we do not want to pay any men except those working at the mill from which he supplies us with lumber. The only reason we ask him to give orders is, that if he got the cash, he might pay Red River men instead of the men he should pay. We are in no way responsible for the men's wages, directly or indirectly.

"You need not say anything to anybody about this. Simply write on the order as you did before if you are asked to.

"Yours truly,
"McPhee & McGinnity."

We shall not consider the assignments of error relative to receiving and refusing to receive testimony, for the reason that the abstract contains no objection nor exception to the ruling of the court. The abstract contains the evidence in the narrative form, and the questions and answers and the ruling of the court upon objections to testimony are not given. True it is that in the assignment of errors the questions and answers are given, and the state-

ment is made that the testimony was received over the objection of the defendant; and we are referred to the bill of exceptions. But the rules of the court require that the abstract shall show the objections and the rulings thereon and the exceptions taken thereto.

Nor shall we discuss the other assignments of error, for the reason that we are of opinion that, upon the defendants' testimony, the plaintiff is entitled to recover. We do not regard the condition claimed by the defendants as such a condition as will defeat the plaintiff's right of recovery, and we agree with the court of appeals in its opinion given at the time the case was before that tribunal, when it says: ''The condition annexed to the agreement would not relieve them, even conceding its existence. What the rule would have been had McPhee & McGinnity been advancing their own money, or what the rule would have been if it was determined that they would suffer loss by the acceptance and payment, we need not determine. The drafts were really drawn by an authorized agent on his own funds and were a specific appropriation of these funds to the payment of the bills or orders which he drew. McPhee & McGinnity had no right to stop the payment of the checks which they had sent to pay these orders. The orders were drawn with authority and under the promise of the drawees; they had been bought by Fowler and Underwood on the faith and strength of that promise * * * and before any breach of the condition and before any right to rescind had accrued.''

McAlpine left with McPhee & McGinnity the sum of $845.00; he was charged with the sum of $125.00, being five per cent of $2,500, the rate they charged for the use of the money for one month. The letter written by the firm to their representative in

New Mexico directed him to O. K. the orders and to make a memorandum on the orders, "This man worked for McAlpine at his mill," and stated: "You understand our reason for this is that we do not want to pay any men except those working at the mill from which he supplies us with lumber. The only reason that we ask him to give the orders is that if he got the cash he might pay Red River men instead of the men he should pay."

These orders were all indorsed, as directed, by the representative of McPhee & McGinnity. They were charged to McAlpine's account. Checks were drawn and sent to New Mexico for the purpose of paying them; payment of the checks was stopped, but the orders were never returned.

We find no prejudicial error in the record which would warrant us in disturbing the verdict. The judgment is therefore affirmed.

*Affirmed.*

The CHIEF JUSTICE and Mr. JUSTICE CAMPBELL concur.